IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

SAKIE SCOTT,

                Plaintiff,

v.                                      No. 08 CV 1457

ILLINOIS STATE MEDICAL INSURANCE
SERVICES, INC.,

                Defendant.

## ANSWER TO AMENDED COMPLAINT

Defendant, Illinois State Medical Insurance Services, Inc., by its attorneys and for its response to Plaintiff's Amended Complaint states as follows:

**PARAGRAPH 1:**

For purposes of this Complaint, Illinois State Medical Insurance Services, Inc. shall be hereinafter referred to as "ISMIE". Laura Hutchinson shall be referred to as "Hutchinson". Sheila Coghlan shall be referred to hereinafter as "Coghlan". Jacinth Stokes shall be referred to as "Stokes". Donna Gentiles-Karas shall be referred in her capacity as Assistant Vice President of "Human Resources".

**ANSWER:**

Defendant admits.

**PARAGRAPH 2:**

Plaintiff began employment with ISMIE on July 1, 2004 as an Underwriting Secretary. Plaintiff remained in same position throughout employment until February 20, 2008. Plaintiff received first evaluation (6 months) in December 2004. Evaluation was standard language for a new employee. (See Exhibit B)

**ANSWER:**

Defendant admits that Plaintiff began employment with ISMIE on July 1, 2004 as an Underwriting Secretary and that Plaintiff remained in the same position throughout her employment until February 20, 2008.  Defendant further admits that Plaintiff received her first evaluation in December 2004 after six months employment but denies the remaining allegations.

**PARAGRAPH 3:**

Plaintiff received first annual review dated July 1, 2005.  Hutchinson's first negative remarks were related to "distractions, occasional errors and socializing in the department".  (See Exhibit C).  Hutchinson didn't realize that issues came up on a regular basis which caused Plaintiff to have contact with the underwriters, technicians and mail room staff to discuss business.  This was explained to Hutchinson on numerous occasions.  Because the office consisted of 7 ft.  individual cubicles, it was easier to directly approach that individual rather than telephone.

**ANSWER:**

Defendant admits that Plaintiff received her first annual review in July 2005 but denies the remaining allegations.

**PARAGRAPH 4:**

Plaintiff states that there was no further work related communication between July 2005 and September, 2005 that was significant.  Plaintiff contacted Human Resources and scheduled an interview for the Underwriting Technician position that became available.  Even though the "selection committee" consisted of four individuals, Hutchinson and Coghlan were the two main individuals with the most influence on the decision making process because of their positions in the department as Assistant Vice President and the fact that they are close friends that dined together daily.

**ANSWER:**

Defendant admits that Plaintiff applied for an Underwriting Technician position on or about September 20, 2005, that Hutchinson and Coghlan were members of the hiring committee

for that position and that Hutchinson and Coghlan regularly ate lunch together but denies the remaining allegations.

## PARAGRAPH 5:

The first interview was scheduled for October 11, 2005.  Coghlan and Hutchinson cancelled without any notice to Plaintiff, even though Hutchinson was the immediate supervisor to Plaintiff.  When Plaintiff arrived at Hutchinson's and Coghlan's office and found it empty, Plaintiff e-mailed them for an explanation.  No response was given from Hutchinson and Coghlan that day.  (See Exhibit R)

## ANSWER:

Defendant admits that Plaintiff was scheduled to interview for the Underwriting Technician position in October 2005 and that Hutchinson was Plaintiff's immediate supervisor but denies the remaining allegations.

## PARAGRAPH 6:

Christine Majerik of Human Resources called to say that the meeting was cancelled.  The interview was scheduled for a couple of days later which resulted in a negative outcome for the Plaintiff.  The interview was conducted with Frode Brudvik, a former employee, Michi Smith, Laura Hutchinson and Sheila Coghlan.

## ANSWER:

Defendant admits that Frode Brudvik, Michi Smith, Hutchinson and Coghlan interviewed Plaintiff for the Underwriting Technician position but denies the remaining allegations.

## PARAGRAPH 7:

On October 24, 2005, Plaintiff was notified by Human Resources (Christine Majerik) that the job was given to another individual, Pamela Phelps, (a younger Caucasian female), from outside of the company.  Plaintiff sent an email to Human Resources questioning the decision. Christine Majerik responded that no reason was given.  Plaintiff could only surmise that Coghlan and Hutchinson conspired together to hire a Caucasian to fill the position and succeeded in their efforts to discriminate against Plaintiff.  Hutchinson who had daily contact with the Plaintiff never made any comments on the decision.  (See Exhibit  )

**ANSWER:**

Defendant admits that Plaintiff was notified by telephone on October 24, 2005 that she was not selected for the Underwriting Technician position, that Pamela Phelps, a white, female who is younger than Plaintiff, was offered the job, that Plaintiff sent an email to Christine Majerik in Human Resources asking for documentation placed in her file about why she did not receive the position and that Hutchinson never discussed the decision with Plaintiff. Defendant denies that Coghlan and Hutchinson conspired together to hire a Caucasian to fill the position in an effort to discriminate against Plaintiff and denies the remaining allegations.

**PARAGRAPH 8:**

In February of 2006, a position became available in the claims department as a Claims Representative. Plaintiff interviewed with Kelly Kehoe, Manager and Christine Renfrow, Assistant Vice President of the Claims department. Both interviews went extremely well and the conversation all but assured the Plaintiff that she had the position since she had over 20 years experience in the legal field and fit the job description. Sometime between February 24, and March 1st, Hutchinson spoke with Kehoe and/or Renfrow of the Claims department and gave them such a negative report on Plaintiff that the job was given to another individual. This individual was another younger, Caucasian female from outside of the company. The Plaintiff's contends that her life experience (age 50), 20 years previous experience in the legal field as a Certified Paralegal/Legal Assistant from Roosevelt University, and part-time Grant Accountant experience at Chicago State University, should have qualified for the entry level position in the claims department.

**ANSWER:**

Defendant admits that Plaintiff applied for a Claims Service Representative position in February 2006, that she interviewed with Kelly Kehoe, Professional Liability Manager, and Christine Renfrow, Assistant Vice President of Claims Administration, that Renfrow contacted Hutchinson to discuss Plaintiff's performance and that another white, female applicant who is younger than Plaintiff was offered the position. Defendant denies the remaining allegations.

**PARAGRAPH 9:**

On March 5, 2006, Plaintiff received a telephone call from Greg Davis stating that Hutchinson had blocked the transfer. Kelly Kehoe personally approached the Plaintiff and stated the same regarding Hutchinson's statements blocking the transfer. Plaintiff was in "awe" of the decision and went to Hutchinson's office to inquire about the negative information that was given in her response to the transfer. Hutchinson stated that "you still have issues with your work". When Plaintiff questioned Hutchinson about what she was referring to, Hutchinson remained silent. Plaintiff was at this point beginning to feel uneasy about Hutchinson as an immediate supervisor and her ability to communicate more effectively with staff members.

**ANSWER:**

Defendant denies that Kehoe personally approached the Plaintiff stating that Hutchinson had blocked the transfer, that Plaintiff went to Hutchinson's office to inquire about negative information given regarding the transfer, that Hutchinson stated that "you still have issues with your work" and that when Plaintiff questioned Hutchinson about what she was referring to Hutchinson remained silent. Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations and therefore denies same.

**PARAGRAPH 10:**

Kehoe and Renfrow tried to intervene on behalf of the Plaintiff by consulting with Tim Saunders, Vice President of Claims, but were informed that there was nothing he could do to override Hutchinson's remarks which ultimately precluded the Plaintiff from transferring out of the underwriting department. (Witnesses: Kelly Kehoe, Christine Renfrow, Greg Davis and Tim Saunders).

**ANSWER:**

Defendant denies.

**PARAGRAPH 11:**

There were no negative discussions between Plaintiff and Hutchinson between March '06 and July '06. Plaintiff was sure that the upcoming evaluation would be "TRUE AND CORRECT". One week prior to Plaintiff's evaluation in July, 2006) Plaintiff processed 567 loss history letters in two days (an extraordinary amount of work from one individual). This effort was not noted on the upcoming evaluation. (See Exhibit D)

**ANSWER:**

Defendant denies.

**PARAGRAPH 12:**

There were numerous requests made by Plaintiff of Hutchinson to assist others with their backlog of work. Plaintiff was also responsible for a myriad of backup duties during the absence of her co-worker, Carol Smith that included: incoming mail, processing faxes, end of day and mailing previous invoice, that she would sometimes be responsible for IN ADDITION to her normal daily tasks. (See Exhibit Z)

**ANSWER:**

Defendant admits that in addition to her daily tasks, Plaintiff was occasionally responsible for assisting with backup duties when her co-worker, Carol Smith, was absent, which included: processing incoming mail and faxes and mailing invoices. Defendant denies the remaining allegations.

**PARAGRAPH 13:**

Management met with staff to discuss an upcoming unit luncheon in early December, 2006. At the luncheon it was stated that the staff "was not to order two entrees". The purpose of this discussion was because of an employee, Tanya Moorer, who ordered two separate entrees from the previous unit luncheon at the Grand Lux Cafe. On December 11, 2006, the office attended the luncheon, Plaintiff ordered a "surf and turf". After the luncheon, Keith Evans reported back to Hutchinson that the Plaintiff ordered a "surf and turf meal. (See reference to this action further in this Complaint)

**ANSWER:**

Defendant admits that in early December 2006, prior to a staff luncheon, Hutchinson told the staff to be reasonable and use their discretion when ordering from the menu and that following the meeting, on December 11, 2006, Plaintiff ordered a "surf and turf" meal at a staff luncheon. Defendant further admits that Keith Evans reported back to Hutchinson that the Plaintiff ordered a "surf and turf" meal. Defendant denies the remaining allegations.

CHICAGO/#1804617.2

**PARAGRAPH 14:**

Plaintiff was called into the office at 4:15pm, and asked to close the door and grilled about the lunch that was ordered. Hutchinson asked the Plaintiff why she ordered a "surf and turf". Plaintiff explained to Hutchinson that a "surf and turf" meal was not considered two separate entrees and that cost of the meal was never discussed at the prior meeting, rather the number of entrees ordered by each individual. Plaintiff also explained to Hutchinson that there were no additional appetizers, drinks, or desserts ordered like the others which would make up the price difference. Plaintiff also advised Hutchinson that if price were an issue, it should have been mentioned in the meeting.

**ANSWER:**

Defendant admits that following the luncheon Hutchinson asked Plaintiff to come in to her office and addressed Plaintiff's ordering a "surf and turf" meal. Defendant denies the remaining allegations.

**PARAGRAPH 15:**

Further, Plaintiff contends that ISMIE spends thousands of dollars on food for their employees several times a year and that price has never been an issue, but rather another way for Hutchinson to display her tactics of harassment. Plaintiff stated that ISMIE's wasteful spending of money on food at various meetings make it impossible for Hutchinson to question one lunch ordered by a staff member. At the end of the meeting, Hutchinson actually asked the Plaintiff "did you finish the meal"? (Witnesses: Edna McLauren, Charlotte Jackson, and Georgia Thompson who are employed in the meeting services department.)

**ANSWER:**

Defendant denies.

**PARAGRAPH 16:**

Hutchinson's continued negative remarks regarding the Plaintiff's work in evaluations, constant tactics of harassment and creation of a hostile work environment prompted the Plaintiff to lodge a complaint against Hutchinson with Human Resources on December 14, 2006 covering a series of events that occurred between 07/2004 and 12/06. (See Exhibit E)

CHICAGO/#1804617.2

**ANSWER:**

Defendant admits that Plaintiff complained about Hutchinson to Human Resources on or about December 15, 2006 regarding incidents that occurred between September 20, 2005 and December 2006.  Defendant denies the remaining allegations.

**PARAGRAPH 17:**

On January 11, 2007.  After inquiring about the status of the Complaint, Plaintiff received an email from Human Resources stating that the investigation was complete.  When Plaintiff asked for documentation regarding the investigation, Plaintiff was emailed by Donna Gentiles-Karas that this information was confidential and that there was no documentation that could be given to the Plaintiff regarding the Complaint.  (See Exhibit )

**ANSWER:**

Defendant admits that Gentile-Karas emailed Plaintiff on January 11, 2007 to inform her that an investigation into Plaintiff's complaints was conducted and completed.  Defendant also admits that investigation documentation is confidential but denies the remaining allegations.

**PARAGRAPH 18:**

Plaintiff received another evaluation from Hutchinson on July 2007 which deteriorated even further in content and percentage of raise.  Hutchinson listed tasks on the evaluation which did not belong to Plaintiff.  The number of items marked in the "Does Not Meet Expectations" category DRAMATICALLY since the 2006 evaluation.

**ANSWER:**

Defendant admits that Plaintiff received a performance evaluation from Hutchinson in July 2007 and that the number of items marked in the "Does Not Meet Expectations" category increased from her August 2006 evaluation.  Defendant denies the remaining allegations.

**PARAGRAPH 19:**

Plaintiff questioned Hutchinson to find out why she never received any type of disciplinary action if the work had deteriorated so heavily during the list year.

**ANSWER:**


Defendant denies.

**PARAGRAPH 20:**

Hutchinson tried to give the illusion that "typing" was the primary task of the Plaintiff and that the typing precluded the Plaintiff from achieving higher standards from within the department. Plaintiff questioned Hutchinson about the remaining negative remarks during evaluation even stating that "maybe you have the wrong evaluation". As a "manager in training" Stokes was allowed to witness the discussion between Plaintiff and Hutchinson but not allowed to intervene since she had no PRIOR or "REAL" authority over Plaintiff. Plaintiff realized that Hutchinson was trying to justify the actions taken to preclude the Plaintiff from advancement into the Underwriting technician position recently. Stokes was not considered a viable candidate to make decisions or pass judgment on employees as a "trainee."

**ANSWER:**


Defendant admits that Jacinth Stokes witnessed Plaintiff's performance evaluation in July

2006 but denies the remaining allegations.

**PARAGRAPH 21:**

Plaintiff states that on the few occasions that she tried to approach Stokes, she was reprimanded by Hutchinson that she was only to report to her and not STOKES.

**ANSWER:**


Defendant denies.

**PARAGRAPH 22:**

Hutchinson was questioned by the Plaintiff about the decrease in raise by one point since the prior evaluation, Hutchinson responded that "it is not lower", which indicates that Hutchinson's overall intentions were to keep the Plaintiff from advancing in the company and department.

**ANSWER:**


Defendant denies.

**PARAGRAPH 23:**

Plaintiff applied for the position of Underwriting Technician for a second time, which would have been a promotion in the Underwriting department. On June 29, 2007, Plaintiff was granted an interview with no advance notice. Hutchinson was also present at the meeting which showed a conflict of interest since she was Plaintiff's immediate supervisor and had a complaint lodged against her.

**ANSWER:**

Defendant admits that Plaintiff applied for a second Underwriting Technician position on or about June 29, 2007 and that the Underwriting Technician position would have been a promotion in the Underwriting department. Defendant also admit that Hutchinson was a member of the hiring committee for that position, that she was Plaintiff's immediate supervisor and that Plaintiff had complained about her to Human Resources in December 2006. Defendant denies the remaining allegations.

**PARAGRAPH 24:**

Plaintiff states that during the interview, Coghlan exhibited a very condescending attitude, occasionally glancing at Hutchinson for her reaction.

**ANSWER:**

Defendant denies.

**PARAGRAPH 25:**

Plaintiff contends that during the interview for the Underwriting Technician position, Coghlan was very curt and crude. Coghlan began asking questions that were not relevant to the job at all. Coghlan took the time to ensure that the questions she posed to the Plaintiff were ones that could not be answered unless a person was trained in that position or to "prep" a person from outside of the company with the answers of such confidential information.

1.    "What goes on the Prep side of the folder?"

2.    "Why didn't you ask to be trained in Greg's position prior to his departure?"

3.    "Why haven't you applied for anything outside of the Underwriting department?"

4.    "Aren't you in a nursing program in school?"

S.    "What school do you attend?"

6.    "What classes are you taking?"

**ANSWER:**

Defendant generally denies the allegation but lacks knowledge or information sufficient to form a belief about the specific questions asked during the interview and therefore denies same.

**PARAGRAPH 26:**

On several occasions, Plaintiff tried to answer questions posed by Coghlan, however, before Plaintiff could begin to answer a question, would interject with another question. Coghlan became so belligerent during the interview that Plaintiff didn't get a chance to comment on any other questions before being rushed out of the office.  Further, the remaining questions were only issues that Davis, himself, would know since he was Coghlan's "personal secretary" occasionally running errands that sometimes included transporting Coghlan's expensive jewelry for repairs.

**ANSWER:**

Defendant denies.

**PARAGRAPH 27:**

Plaintiff states that Coghlan continued to "reprimand" and "humiliate" Plaintiff in front of her close friend and confidante, Hutchinson during the interview process.  At the end of Coghlan's interview turned "interrogation", Coghlan asked Hutchinson if she wanted to add anything.  Hutchinson replied "Aren't you taking a biology class?" This interview had become a "game" between Hutchinson and Coghlan.

**ANSWER:**

Defendant denies.

**PARAGRAPH 28:**

On July 1, 2007, Plaintiff received a PREDATED letter for June 20, 2007 stating that they had selected another individual for the position (Bill Blake, a Caucasian).  When the Plaintiff realized this letter was dated June 20, 2007, ONE WEEK PRIOR TO THE INTERVIEW, it became clear that Hutchinson, Human Resources and Coghlan had previous knowledge that Plaintiff wasn't going to be promoted since the interview date was June 29, 2007, NINE DAYS AFTER THE LETTER WAS WRITTEN.  Plaintiff states that her co-worker and "personal friend", Davis, had indeed confided in Coghlan that Plaintiff was going to apply for the position since other questions were ONLY known to Davis.  (See Exhibit )

- 11 -

**ANSWER:**

Defendant admits that Plaintiff received a letter dated June 20, 2007 informing her that she was not selected for the Underwriting Technician position. Defendant denies the remaining allegations.

**PARAGRAPH 29:**

Plaintiff also states that it was at this time that she realized that Coghlan knew of all of her personal information regarding outside work activity through Greg Davis, the former employee and personal secretary to Coghlan.

**ANSWER:**

Defendant denies that Coghlan knew of all of Plaintiff's personal information regarding outside work activity through Greg Davis but lacks knowledge or information sufficient to form a belief about what Plaintiff "realized" and therefore denies same.

**PARAGRAPH 30:**

Even though Plaintiff was more than qualified and experienced for the position, Hutchinson and Coghlan conspired to denies Plaintiff the promotion for a second time. Blake (Caucasian) is a personal friend and neighbor of Coghlan's. Because Blake had no office work experience, Coghlan had to assist him in completing his employment application. (Witnesses: Gentiles-Karas, Brenda, Receptionist, Coghlan, Hutchinson) Blake's sister is Coghlan's babysitter. Plaintiff also contends that the position was actually a secretarial position and that only recently did it become upgraded to Technician after Davis had exceeded the amount of money that could be paid to a secretary. (See Exhibit CC)

**ANSWER:**

Defendant denies.

**PARAGRAPH 31:**

Plaintiff contends Coghlan and Hutchinson are "inseparable" on the job which was a conflict of interest for the interview held by the two individuals to act in their capacity collectively. Witnesses (Underwriting and Claims employees).

**ANSWER:**

Defendant denies.

**PARAGRAPH 32:**

Plaintiff states that Hutchinson worked with Coghlan to keep Plaintiff from obtaining the position of Underwriting Technician that became open in June 15, 2007. Plaintiff contends that Davis' position only reported to Coghlan for typing and/or very private, personal projects and PREP was strictly confidential because of the HIPPA Act.

**ANSWER:**

Defendant denies.

**PARAGRAPH 33:**

Plaintiff contends that Coghlan was a personal friend of the employee, Davis, that departed from "ISMIE" on July 15, 2007. Plaintiff discussed the possibility of applying for the position that he was vacating. Davis informed the Plaintiff that Coghlan had already decided who she was going to bring in to fill the vacancy PRIOR to the job posting at work. Plaintiff still felt that it was her right to try and pursue the position even though Coghlan chose to hire her neighbor and personal friend, Bill Blake.

**ANSWER:**

Defendant lacks knowledge or information sufficient to form a belief about Plaintiff's feeling that it was her right to try and pursue the position and therefore denies same. Defendant denies the remaining allegations.

**PARAGRAPH 34:**

Plaintiff requested one day off "unpaid" on November 21, 2007 to attend a doctors appointment. When Plaintiff realized from the manual that this was not possible, the request was rescinded, although provisions had been made by another employee, Tanya Moorer, to travel abroad in December, 2006 with no accrued time available through a different supervisor, Stokes.

**ANSWER:**

Defendant admits that Plaintiff requested to take an unpaid absence on November 21, 2007 and later requested instead to come in early or leave later on that day. Defendant admits

- 13 -

that another black, female employee, Tanya Moorer, was permitted to travel abroad in December 2006 with no accrued time available because of a special request under extenuating circumstances.  Defendant denies the remaining allegations.

**PARAGRAPH 35:**

Hutchinson and Gentiles-Karas collaborated together to write up a Notice of Corrective Action on November 5, 2007 for probation based on "excessive absenteeism" even though Plaintiff HAD NOT EXCEEDED ANY accrued time off for the year.

**ANSWER:**

Defendant admits that Hutchinson and Gentile-Karas prepared a Written Warning in November 2007 to address Plaintiff's excessive requests for unscheduled time off.  Defendant denies the remaining allegations.

**PARAGRAPH 36:**

Plaintiff sought out the assistance of Human Resources via email in December of 2007, to try and resolve this matter.  However, there was no response to email.  (See Exhibit I).

**ANSWER:**

Defendant admits that Plaintiff sent an email to Human Resources in December 2007 regarding her excessive absenteeism but denies the remaining allegations.

**PARAGRAPH 37:**

Plaintiff states that upon reviewing her file, for further action, she discovered a Notice of Corrective Action form for warning on absenteeism that had been sent in with the response from Defendant.

**ANSWER:**

Defendant admits that the Written Warning was placed in Plaintiff's personnel file but lacks knowledge or information sufficient to form a belief about what Plaintiff "discovered" and therefore denies same.

**PARAGRAPH 38:**

Plaintiff states that Hutchinson and Gentiles-Karas, Human Resources conspired to generate a "bogus" warning.  Plaintiff never received such warning and it was unsigned and undated.  In the letter dated November 9, 2007, from Defendant' attorney states that the Plaintiff did was not given the "warning" because they did not want the action to appear retaliatory" therefore this disciplinary action was skipped.  (See Exhibit L)

**ANSWER:**

Defendant admits that Plaintiff never received the unsigned and undated Written Warning and that the Written Warning was not issued so that it would not be perceived as retaliatory. Defendant denies the remaining allegations.

**PARAGRAPH 39:**

Plaintiff also discovered a response from Hutchinson which was "supposedly" typed in December of 2006, while reviewing the ISMIE response from ISMIE's attorneys.  Plaintiff realized that ISMIE had placed Hutchinson's response to the complaint lodged in DECEMBER 14, 2006 in the Plaintiffs EEOC file.  (See Exhibit L)

**ANSWER:**

Defendant admits that Hutchinson prepared a memo in response to Plaintiff's complaints to Human Resources in December 2006 but lacks knowledge or information sufficient to form a belief about what Plaintiff "realized" and therefore denies same.

**PARAGRAPH 40:**

Plaintiff states that when she questioned Gentiles-Karas, from Human Resources, her email states that this information was confidential.  (See Exhibit E)

**ANSWER:**

Defendant denies.

**PARAGRAPH 41:**

Plaintiff states that there is no REAL evidence that Hutchinson actually typed this response in answer to the Complaint filed in December 2006 since this document was never revealed to the Plaintiff.

- 15 -

**ANSWER:**

Defendant denies.

**PARAGRAPH 42:**

Hutchinson's "Memo to File" is filled with erroneous statements.  See below:  (See Exhibit L)

¶1.  Hutchinson states that she has no recollection of the first interview scheduled.  Hutchinson's statement is untrue.  (See Exhibit X)

¶2.  Hutchinson states that "Sakie's responsibility is to provide secretarial support to me."  As stated above in this complaint, I have never been Hutchinson's secretary in the 3½ yrs. with ISMIE.  My primary task was to process new business screening and loss history letters.  (See Exhibit Y) Hutchinson's statement is untrue.

Hutchinson created tasks that were demeaning to Plaintiff in an effort to further humiliate Plaintiff in the department such as:  "coming to her office five times a day just to "check in" even if there were outstanding issues and to deliver Xerox paper to her office".  These tasks constantly removed the Plaintiff from her daily flow of work.  Plaintiff was not Hutchinson's "personal secretary", but rather a new business screener.  (Note:  When Plaintiff's duties changed in July of 2007, Carol Smith, a Caucasian female, took over the task of typing weekly PUMA minutes for Hutchinson.  Plaintiff asked if she had to transport reams of Xerox paper into Hutchinson's office and the response was "no".)  Hutchinson even scheduled Plaintiff to move equipment when the Plaintiff was out of the office on vacation. (See Exhibit Z)

It was a known fact in the entire office that Plaintiff had double bypass surgery recently and could not lift items as stated due to the unstable angina that the Plaintiff suffered with occasionally.

Hutchinson continued to make such requests on Plaintiff.  In December, 2007, sent another email to Plaintiff to remove boxes of paper which weighed at least 50-100lbs lbs, even though there were at least 15 men in the department and the Plaintiff was on vacation that day.  Plaintiff had to solicit the assistance of Blake, Sullivan, Davis and Schmidt on several occasions.  (See Exhibit Z)

¶3.  Plaintiff states there were never documents typed for Hutchinson created initially by Plaintiff as stated in the memo.  The documents that Hutchinson refers to are one page documents that were "EDITED" and consisted of making additions or deletions weekly according to the meeting.  On occasion Ronald Koves, Underwriter would generate the changes to be made on this document. Documents summaries reveal the history of each document and the number of times that it was accessed on each occurrence.  Plaintiff contends that the number

- 16 -

*of revisions usually consisted of two times per occurrence. Initial access to open and second time accessed to open and send to Hutchinson and the rest of staff.*

*No document was ever created "initially" by Plaintiff because all of the documentation in the system were created by previous employees in that position. Plaintiff basically typed one document per week. Other documents typed consisted of "boilerplate language" which only required the addition of a physician name, date, etc.... Hutchinson seemed to be "out of touch" with the Plaintiff actual duties (See Exhibit P).*

*¶4. Hutchinson states that the Plaintiff needed to "focus more on her work and less distractions on the floor". Plaintiff states that it was explained to Hutchinson consistently that these "social distractions" were work related and that it was the easiest way to communicate with other staff members especially when the Underwriting department went paperless.*

*¶5. did not know how to react in situations that involved controversial matters. Hutchinson never contacted the other individual in the Plaintiff's cubicle. A witness Carol Smith, who initially sat next to Plaintiff in the same corridor, heard the two employees in the cubicle having conversation. Plaintiff contends that Hutchinson lacksed the supervisory skills to handle this matter in a more effective manner. Because of Hutchinson's actions in this matter, there was more of a hostile work environment created with Plaintiff, Willet Welch and Keith Evans.*

*¶6. Hutchinson states that Michi Smith had conversations with Jon Olson, Sean Sullivan and Terry Moore on November 21, 2006, and that the Plaintiff was "totally distracting" because of "loud noise, personal calls and cell phone usage during business hours. "Plaintiff contends that Hutchinson's statements in this paragraph have embellished the truth to make it appear that Plaintiff was creating a "partylike" atmosphere on a regular basis. Plaintiff contends that the phone activity that were heard by others were prefabricated statements. Plaintiff contends that Olson did move his desk immediately after the Plaintiff moved to the next cubicle. Plaintiff also states that because she was in such close proximity to Olson prior to the move, if Plaintiff was so "disruptive" during three years of employment with ISMIE, something would have been mentioned before 2007. Plaintiff also states that this statement in Hutchinson's "Memo" is questionable because of the other individuals in the same corridor weren't questioned. (Deborah Connie, Wendy Roberson and Beth McNicholas.*

*Plaintiff also contends that Sullivan was guilty of the same accusation himself as stated in the above paragraph. Sullivan, Welch, and Schmidt engaged in "partylike" activity continuously. (Witnesses to this activity were Deborah Connie, Carol Smith, Brenda Cowens, Jamie Donovan, Sarah Maddock, Wendy Roberson, just to name a few. Hutchinson's accusations are unfounded in this paragraph. Plaintiff was located furthest from the rest of the staff on the end wall where no one else was located for constant "socializing". Hutchinson was*

- 17 -

*oblivious to the actions that occurred in the department as a whole since her office was located in another section of the floor.*

**ANSWER:**

Defendant denies that Hutchinson's "Memo to File" is filled with erroneous statements and denies the remaining allegations. Defendant further states that the remaining portions of this paragraph are contentious or argument to which no response is required.

**PARAGRAPH 43:**

After an illness on January 7, 2008 to January 9, 2008, Plaintiff returned to work with a doctor's note for the two days taken off even though a note was not warranted until the employee was off more than three consecutive days. Plaintiff was directed by Human Resources three times to have the physician rewrite the doctor's statement upon returning to the office. (Witnesses: Joy, Dr. Prem Hammond Clinic.) (See Exhibit O)

**ANSWER:**

Defendant admits that Plaintiff provided a doctor's note upon her return to work on January 10, 2008 excusing her absences from Monday, January 7, 2007 through Wednesday, January 9, 2008. Defendant denies the remaining allegations.

**PARAGRAPH 44:**

During the Plaintiff's time off, Hutchinson continuously telephoned various family members that contributed to an additional amount of stress on the family members. Also, during Plaintiffs' time off, Hutchinson and Stokes met with the Underwriters and Technicians to have them alert them of any ISSUES made in the New Business Screening that Plaintiff processed contributing further to create a "hostile work environment".

**ANSWER:**

Defendant admits that after Plaintiff had not contacted ISMIE to inform them of when she expected to return to work, Hutchinson contacted Plaintiff's Emergency Contact for information about when Plaintiff intended to return to work. Defendant denies the remaining allegations.

CHICAGO/#1804617.2

## UNLAWFUL DISCHARGE

**PARAGRAPH 45:**

On January 21, 2008, Plaintiff took ill from unstable angina and highly elevated blood pressure and received a doctor's statement which was faxed to HR. Plaintiff's mother called in sick for the Plaintiff and spoke with Hutchinson on January 22nd, 2008, and stated Plaintiff was going to be out sick.

**ANSWER:**

Defendant admits that Plaintiff called in sick on January 21, 2008 and that Plaintiff's mother spoke with Hutchinson on January 22, 2008 and told her that Plaintiff was going to be out sick. Defendant denies the remaining allegations.

**PARAGRAPH 46:**

Plaintiff telephoned and stated to Hutchinson that the time off would be extended to January 28th, after a visit to the cardiologist for follow-up. Plaintiff faxed a doctor's statement to Human Resources "Until Further Notice" for a return date.

**ANSWER:**

Defendant admits that on January 23, 2008 Plaintiff told Hutchinson that she had a doctor's appointment scheduled on January 28, 2008 and that she would not return to the office before then. Defendant denies the remaining allegations.

**PARAGRAPH 47:**

After all accrued time had been allotted, ISMIE, Human Resources, Gentiles-Kraus advised that the Plaintiff would she would have to have forms signed for Short Term Disability if she would be out indefinitely.

**ANSWER:**

Defendant admits that after Plaintiff exhausted her accrued time, Gentile-Karas informed her that she would need to complete forms to qualify for Short Term Disability. Defendant denies the remaining allegations.

CHICAGO/#1804617.2

**PARAGRAPH 48:**

On February 13, 2008, Plaintiff sought a second opinion who had just become employed with the clinic the week before in the cardiac unit for further medical treatment. The Plaintiff's blood pressure was still too elevated to return to work. Therefore, the short term disability forms were signed by Brian Kraus, C-FNP and faxed to the Human Resources department. Defendant refused to accept the forms for short term disability stating that this he was not a "physician" and then subsequently the Plaintiff was terminated on February 20, 2008. (See Exhibit O)

**ANSWER:**

Defendant admits that Plaintiff faxed to Human Resources a Certification of Physician form signed by Brian Kraus, a Certified Nurse Practitioner, and that Human Resources required Plaintiff to have the form signed by a physician. Defendant also admits that Plaintiff was terminated from employment effective February 20, 2008. Defendant lacks knowledge or information sufficient to form a belief about the remaining allegations and therefore denies same.

**PARAGRAPH 49:**

Defendant, Human Resources willfully lied in the Letter of Termination dated February 20, 2008, stating that "on February 14, 2008, a call was placed to Hammond Clinic and that they spoke with Ms Susan Archie, employee, confirming that Brian Kraus was not a doctor, he was a nurse practitioner." (Exhibit O)

**ANSWER:**

Defendant denies.

**PARAGRAPH 50:**

After receiving the letter on February 21, 2008. Plaintiff personally drove to the Hammond Clinic and confronted Ms. Susan Archie regarding the statement that was in the Letter of Termination.

**ANSWER:**

Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations and therefore denies same.

CHICAGO/#1804617.2

**PARAGRAPH 51:**

On Friday, February 25, 2008, Ms. Cathy Zackiewicz, the head of Patient Services at Hammond Clinic, telephoned the Plaintiff stating that "no one in her office had spoken with anyone with ISMIE", and that she was "outraged that the Defendant would try and implicate Hammond Clinic in what appeared to be "some type of finalization of employment" between the Plaintiff and her employer.  A letter was sent to ISMIE, Human Resources stating the same and a copy is attached to this complaint hereto.  Witnesses:  Cathy Zackiewicz and Ms. Susan Archie of Hammond Clinic.  (See Exhibit O).

**ANSWER:**

Defendant admits that on February 25, 2008, Kathleen M. Zackiewicz, Director of Patient Services at Hammond Clinic, sent a letter to ISMIE Human Resources stating that "Susan Archie denies speaking to anyone from your company."  Defendant lacks knowledge or information sufficient to form a belief about  the remaining allegations and therefore denies same.

**PARAGRAPH 52:**

Plaintiff received another letter dated March 5, 2008 from the Defendant's attorney in response to the letter sent to ISMIE from Hammond Clinic.  Defendant's attorney states that she "personally" spoke with someone from Hammond Clinic.  (See Exhibit O)

**ANSWER:**

Defendant admits that on March 5, 2008, Defendant's attorney sent a letter to Kathleen M. Zackiewicz advising that she spoke to Susan Archie at the Hammond Clinic and a copy of the letter was sent to Plaintiff.  Defendant denies the remaining allegations.

**PARAGRAPH 53:**

Plaintiff states that there is no mention of this conversation anywhere in the Letter of Termination dated February 20, 2008 from the Defendant (ISMIE).

**ANSWER:**

Defendant admits.

**PARAGRAPH 54:**

Plaintiff also states that there was never any mention of the attorney's involvement from Human Resources in this matter until the letter was received on March 6, 2008.

**ANSWER:**

Defendant admits.

**PARAGRAPH 55:**

Plaintiff maintains that Hammond Clinic has denied any conversation or communication of any type with ISMIE regarding this "alleged" conversation between the ISMIE attorney and the Hammond Clinic employee, Ms. Susan Archie, HIPPA Director.

**ANSWER:**

Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations and therefore denies same.

**PARAGRAPH 56:**

Plaintiff states that she is still attending Hammond Clinic for closure in this matter and that as of April 3, 2008, Ms. Zackiewicz still maintains that Hammond Clinic has had no prior conversations with anyone from ISMIE or anyone associated with ISMIE on behalf of the Plaintiff.

**ANSWER:**

Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations and therefore denies same.

**COGHLAN'S AFFIDAVIT**

**PARAGRAPH 1:**

On September 27, 2007, Plaintiff filed a formal complaint with EEOC against Defendant.

**ANSWER:**

Defendant admits.

CHICAGO/#1804617.2

**PARAGRAPH 2:**

Coghlan submitted an unsigned and un-notarized affidavit to EEOC which is an evidence of the collaboration between she and Hutchinson to keep Plaintiff from receiving a promotion. Plaintiff contends that this Affidavit is not a legal document since it lackss a signature and date. (See Exhibit N)

**ANSWER:**

Defendant denies.

**HUTCHINSON'S AFFIDAVIT**

**PARAGRAPH 1:**

At times, Hutchinson seemed "out of touch" as evidenced in the Affidavit submitted to EEOC. Hutchinson's lists several tasks that WERE NOT the responsibilities of the Plaintiff. (See Exhibit X for 2006 and 2007)

*\* incoming correspondence (Carol Smith)*

*\*screen loss letters (Sarah Maddock and Corliss Benedict)*

*\*mailing documents (Mail room)*

*\*rate sheets (technicians)*

*\*copy applications (mailroom and publications)*

*¶7 – Harassment see complaint by Plaintiff*

*¶8 On several occasions Plaintiff tried to advise Hutchinson of backlogs created by Deborah Connie (temporary) in the loss history indexing but was denied a chance to help rectify the situation. (Witness: Sarah Maddock and Carol Smith, Deborah Connie (Temporary) Hutchinson stating that it was "the temp's responsibility). This was happening on a regular basis.*

*¶Hutchinson sites work performance problems continuously over 3½ years in every evaluation, however Plaintiff never received any type of disciplinary action from Hutchinson. Hutchinson was capable of termination as evidenced by first Underwriting technician hired in place of Plaintiff, Pamela Phelps in October, 2005.*

*¶Hutchinson states "a pattern of tardiness " that she herself was guilty of during the Plaintiff's entire employment with ISMIE. Hutchinson start time was 8:30am but on every occasion reported to work at approximately 8:50am. Everyday except on Thursdays when she had a 9:00 am meeting to attend. Hutchinson did however change her habits during the unsubstantiated probation that Plaintiff*

*was placed on November 5, 2007. During this time Hutchinson literally raced in past Plaintiff desk at 8:00 am in an attempt to "catch" Plaintiff with late arrivals as evidenced by the (Electronic Key Device ("FOBS")*

**ANSWER:**

Defendant denies and further states that these are not fact allegations but rebuttal to which no response is required.

**PARAGRAPH 2:**

Hutchinson became obsessed with trying to find any and everything negative she could find in an effort to "write up" the Plaintiff.

2004-2005

1.    work performance problems
2.    serious concern
3.    consistent errors
4.    tardiness created additional work for Hutchinson and staff

2005-2006

5.    constant tardiness
6.    improve time and organization skills
7.    too many distractions and socializing, yet Hutchinson suggests to interrupt flow of work to report to her office 5 times daily.

2006-2007

1.    continued work problems
2.    poor quality of work
3.    additional of absenteeism
4.    constant socializing throughout day inconsistent statements:   "Backup work done well but regular tasks constantly erred.

**ANSWER:**

Defendant admits that Plaintiff had the performance problems listed but denies the remaining allegations.

- 24 -

## STOKES AFFIDAVIT

**PARAGRAPH 1:**

Plaintiff states that because this individual had no authority over Plaintiff, Affidavit is only included as an Exhibit to this Complaint.

**ANSWER:**

Defendant admits that Plaintiff included Stokes' Affidavit as an Exhibit to this Complaint but denies the remaining allegations.

**PARAGRAPH 2:**

Plaintiff states that Stokes' Affidavit was of a "personal" nature and cannot be considered a TRUE and CORRECT accounting of Plaintiff's work history with ISMIE in her role as Manager (July 1, 2007-January, 21, 2008, a period of six months).

**ANSWER:**

Defendant denies.

**PARAGRAPH 3:**

Plaintiff also states that Stokes only became Manager of the Underwriting in the summer of 2007 and was in no position to write an Affidavit since Plaintiff was not allowed to consult with her on issues in the Underwriting Division except during the absence of Hutchinson which was no more than 1 week during the time period.  (July 2007 - January 2008)

**ANSWER:**

Defendant admits that Jacinth Stokes was promoted to Underwriting Support Manager in February 2006 but denies the remaining allegations.

**PARAGRAPH 4:**

Plaintiff states that Stokes was "close friends" with Willet Welch, technician who was involved in the incident that Plaintiff questioned

**ANSWER:**

Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations and therefore denies same.

**PARAGRAPH 5:**

Further, Plaintiff states that Stokes was still under training with Hutchinson and not qualified to make sound decisions or pass judgment on employees on her own as of January, 21, 2008.

**ANSWER:**

Defendant denies.

**PARAGRAPH 6:**

Stokes was merely a witness as to incidents involving Plaintiff and Hutchinson.

**ANSWER:**

Defendant states that this is not a fact allegation and no answer is required.

**PARAGRAPH 7:**

Plaintiff was reprimanded by Hutchinson a number of times regarding any discussion between she and Stokes.

**ANSWER:**

Defendant denies.

**PARAGRAPH 8:**

Plaintiff states that Stokes' Affidavit is filled with erroneous statements regarding constant loud noise and poor work performance stemming back to when she was first promoted during Plaintiff's employment with ISMIE as an Underwriter trainee, Underwriter and Underwriting Support Manager.  Stokes was responsible for Moorer, Welch, Cowens, and Maddock.

**ANSWER:**

Defendant admits that Willett Welch, Tanya Moorer and Brenda Cowens reported to Stokes but denies the remaining allegations.

**PARAGRAPH 9:**

Plaintiff states that the two other support individuals were supervised only by Hutchinson.

**ANSWER:**

Defendant lacks knowledge or information sufficient to form a belief about the truth of these allegations and therefore denies same.

**PARAGRAPH 10:**

Plaintiff also states that all work received by Stokes in the role as Underwriter as submitted and approved for rating FIRST by her technician, Brenda Cowens.

**ANSWER:**

Defendant denies.

**PARAGRAPH 11:**

Stokes indicates in her Affidavit that she has "on many occasions discovered errors in her work". In order for Stokes' statement to be "true" would mean that these errors ALSO escaped her Underwriting Technician, Cowens who received and approved the work for the next step which is acceptance or declination for the applicant's policy.

**ANSWER:**

Defendant admits that Stokes' Affidavit states that "on many occasions [Stokes] discovered errors in [Plaintiff's] work" but denies the remaining allegations.

**PARAGRAPH 12:**

Stokes also states that Plaintiff did not read e-mails; however, as stated in this Complaint, the computer remained on "AutoPreview", thereby enabling Plaintiff to read all emails without actually opening the email.

- 27 -

**ANSWER:**

Defendant admits that Stokes also states that Plaintiff did not read e-mails but lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations and therefore denies same.

**PARAGRAPH 13:**

Stokes lists that she could hear conversations, yet her office was more than 50 feet away from the Plaintiff's soundproof cubicle.

**ANSWER:**

Defendant admits that Stokes states that she frequently overheard Plaintiff's conversations and socializing but denies the remaining allegations.

**PARAGRAPH 14:**

Plaintiff states that if this type of disruption was occurring as stated by Stokes, disciplinary action would have been taken outside of the "warnings" including in this Complaint.

**ANSWER:**

Defendant denies.

**PARAGRAPH 15:**

Plaintiff also states that even with the "negative remarks" in Stokes' affidavit only one "warning" was issued during the time of July 1, 2004 to February 20, 2008.

**ANSWER:**

Defendant denies.

**PARAGRAPH 16:**

Stokes has had no involvement in Plaintiff's evaluation or personnel records during the time of her role as "Manager" and cannot therefore make judgment on any such activity that occurred between Hutchinson and Plaintiff.

**ANSWER:**

Defendant admits that Stokes did not conduct Plaintiff's performance evaluations but denies the remaining allegations.

**PARAGRAPH 17:**

Plaintiff also states that Stokes did not mention the Unsigned and Undated Notice of Action form regarding "warning" submitted to EEOC by Defendant, more specifically HR and Hutchinson, which is an indication that she was not actually involved in Plaintiff's employment activity.

**ANSWER:**

Defendant admits that Stokes' Affidavit does not mention the Unsigned and Undated Written Warning but denies the remaining allegations.

**PARAGRAPH 18:**

Plaintiff states that because Stokes has had no personal involvement on a consistent basis, the statement in her Affidavit "[sic].

**ANSWER:**

Defendant states that this is not a fact allegation and no answer is required.

**PARAGRAPH 19:**

Plaintiff states that Stokes' Affidavit is based on some type of "a negative personal tone taken". "From my personal observations of Ms. Scott's work performance. The 2007 Performance Evaluation should have been more critical of her work than it was."

**ANSWER:**

Defendant admits that Stokes Affidavit states "From my personal observations of [Plaintiff's] work, I deem the 2007 Performance Evaluation an understatement of the problems with [Plaintiff's] work performance. The 2007 Performance Evaluation should have been more critical of her work than it was" but denies the remaining allegations.

CHICAGO/#1804617.2

**PARAGRAPH 20:**

Plaintiff states that Stokes' remarks are of a personal nature and not a TRUE and CORRECT accounting of work activity.

**ANSWER:**

Defendant denies.

**PARAGRAPH 21:**

Plaintiff states that Stokes' remarks in the Affidavit are a direct reflection of her own Underwriting Technician which reveal that there was nothing wrong with Plaintiff's work.

**ANSWER:**

Defendant denies.

**DEFENDANT HIRING AND PROMOTING PRACTICES:**

**PARAGRAPH 1:**

Further, Plaintiff contends that Defendant practices discrimination in their hiring and promoting practices.

**ANSWER:**

Defendant denies.

**PARAGRAPH 2:**

As of October 25, 2007, Plaintiff states that there were 221 Caucasian employees and 26 black employees in the Chicago office.  From 04/2006 to 11/2006 there were a total of 29 (Caucasian) new hires, (2 black) and 31 promotions (Caucasian) and 0 black promoted; even though there were black that have been in the claims department over 15 years without being promoted to an advanced position) between 04/2006 and 11/2006.  (See Exhibit Y)

**ANSWER:**

Defendant denies.

CHICAGO/#1804617.2

**PARAGRAPH 3:**

Plaintiff states that the ENTIRE mailroom staff is black, and that each clerk (three black individuals that applied for promotions have been consistently denied requests for promotions namely; Sheila Farmer, Samantha Dancy, Lisa Ferguson.

**ANSWER:**

Defendant denies.

**PARAGRAPH 4:**

Deborah Connie (temporary employee), black, also applied for the same position of Underwriting Technician in 2007 as well as other positions. However, her emails to interview for the position were never acknowledged. (See Exhibit V)

**ANSWER:**

Defendant denies.

## SUMMATION

**PARAGRAPH 1:**

Hutchinson deliberately and willfully orchestrated an act of discrimination and harassment to keep the Plaintiff in the same entry level position for 3½ years.

**ANSWER:**

Defendant denies.

**PARAGRAPH 2:**

Plaintiff contends that during the entire 3½ years of employment with Illinois State Medical Services, Hutchinson also collaborated with various individuals to prevent Plaintiff from promoting or transferring within the company.

**ANSWER:**

Defendant denies.

CHICAGO/#1804617.2

**PARAGRAPH 3:**

Plaintiff contends that sometime around July 1, 2007, Hutchinson solicited the assistance of a newly appointed manager, Jacinth Stokes to assist in her acts of harassment and retaliation against the Plaintiff.

**ANSWER:**

Defendant denies.

**PARAGRAPH 4:**

Hutchinson listed UNTRUE statements on ALL evaluations since 2004-2006 and blatantly lied on the 2007, in an effort to make the Plaintiff appear incapable of holding any other position with "ISMIE" even though all of the positions applied for only requested a high school diploma or GED.

**ANSWER:**

Defendant denies.

**PARAGRAPH 5:**

Hutchinson and Stokes personally went out of their way to harass the Plaintiff until illness overcame the Plaintiff on January 21, 2008.  (See Exhibit O)

**ANSWER:**

Defendant denies.

**PARAGRAPH 6:**

Plaintiff contends that Coghlan knew that there was no time for cross training unless it was initiated by a manager.  Further, Coghlan knew that the Plaintiff could never "shirk" her own responsibilities to train for Davis' position prior to his announcement for departure. Further, Davis was more than an employee, he was a "close friend" of Coghlan's.  Davis and Coghlan shared outside activities together that included concerts, shows, drinks, and dinner.

**ANSWER:**

Defendant admits that occasionally Davis and Coghlan attended concerts, shows, drinks, and/or dinner together but denies the remaining allegations.

- 32 -

**PARAGRAPH 8:**  [SIC]

Plaintiff contends that if Hutchinson felt the statements that she made against Plaintiff were justified, some type of disciplinary actions would have been taken after three years of employment.

**ANSWER:**

Defendant denies.

**PARAGRAPH 9:**

Plaintiff contends that Hutchinson never proceeded with any type of disciplinary action until a complaint was filed against her in December of 2006 and with EEOC in October, 2007.

**ANSWER:**

Defendant states that Plaintiff was regularly counseled by Hutchinson before December 2006 and therefore denies.

**PARAGRAPH 10:**

Defendant is responsible for the Plaintiff losing her livelihood, life insurance policy, health insurance benefits (spouse and child), 401k and sense of pride taken at ISMIE.

**ANSWER:**

Defendant denies.

**PARAGRAPH 11:**

Defendant is also responsible for the deterioration in the Plaintiff's health as a prior heart bypass patient.  Plaintiff advised Hutchinson of her health situation and the consequences of daily stress that she was subjected to on a regular basis and tried to reach out to Human Resources but was constantly ignored.  (See Exhibit E and I)

**ANSWER:**

Defendant denies.

CHICAGO/#1804617.2

**PARAGRAPH 12:**

Hutchinson retaliated against Plaintiff after formal complaint was made in December of 2006 with Human Resources.  No PRIOR disciplinary actions (warnings or probation), were ever taken against employee UNTIL 2007)

**ANSWER:**

Defendant states that Plaintiff was regularly counseled by Hutchinson before December 2006 and therefore denies the allegation.

**PARAGRAPH 13:**

Plaintiff discovered a memo placed in the EEOC file that was not shared with her prior to the EEOC Complaint even when Plaintiff inquired about the response to Human Resources. (See Exhibit L).

**ANSWER:**

Defendant admits that Hutchinson's memo in response to Plaintiff's complaints to Human Resources was not shared with Plaintiff and that it was provided to the EEOC, but lacks knowledge or information sufficient to form a belief about whether Plaintiff "discovered" the memo in the EEOC file and therefore denies same.

**PARAGRAPH 14:**

Evidence of harassment is listed in Hutchinson's memo in the second paragraph stating that Plaintiff should "restock Hutchinson's paper at her desk", a task that no one else provided. Plaintiff states that in her absence Hutchinson assigned tasks of moving equipment even though there were at least 15 men employed in the underwriting department.  (See Exhibit Z)

**ANSWER:**

Defendant denies.

**PARAGRAPH 15:**

Plaintiff states that while placed on the "bogus" probation on November 5, 2007, Hutchinson even changed her daily pattern of tardiness to arrive at work from 8:50am to 7:45-8:00am arrival time in an effort to harass Plaintiff further.  Daily monitoring of the electronic key used by the company should have been sufficient evidence of arrival.  Hutchinson only

- 34 -

monitored Plaintiff's arrival time and no one else's in the department from November 5, 2007 to January 1, 2008.

**ANSWER:**

Defendant admits that Hutchison monitored Plaintiff's arrival time while she was on

probation from November 5, 2007 to December 31, 2007 but denies the remaining allegations.

**PARAGRAPH 16:**

Plaintiff states that the company had a very relaxed atmosphere and that on occasion several employees would come in 10 to 15 minutes late and it was never an issue in the past as long as the time was made up in one form.  (See Exhibit )

**ANSWER:**

Defendant denies.

**PARAGRAPH 17:**

Plaintiff states that in the Defendant's response to EEOC the "Warning" because they didn't want it to appear retaliatory" is evidence of a "collaboration" between Human Resources and Hutchinson.  (See Exhibit )

**ANSWER:**

Defendant denies.

**PARAGRAPH 18:**

Plaintiff states that she trained Sarah Maddock in two of her main tasks in the underwriting division in November of 2005.  On October 9, 2007, Maddock was granted a promotion over Plaintiff for the same position that Plaintiff had been trying to advance to for the last three years.  (See Exhibit T)

**ANSWER:**

Defendant admits that Plaintiff trained Sarah Maddock on new business screening and

that on October 1, 2007 Maddock was promoted to an Underwriting Technician position but

denies the remaining allegations.

CHICAGO/#1804617.2

**PARAGRAPH 19:**

Plaintiff also trained Gina Bules, another employee in the underwriting division in the new business screening process for backup.

**ANSWER:**

Defendant admits.

**PARAGRAPH 20:**

Plaintiff states that Hutchinson and Stokes collectively went out of their way to try and build a negative case against Plaintiff for termination. Plaintiff states that this constant and daily harassment was a direct result of the stress created by these two individuals.

**ANSWER:**

Defendant denies.

**PARAGRAPH 21:**

Plaintiff states that because Hutchinson and Stokes were so vicious and malicious in their attempt to harass the Plaintiff that they conspired to included the entire underwriting department in their escapade with no other regard for the rest of the department by further creating a hostile work environment.

**ANSWER:**

Defendant denies.

**PARAGRAPH 22:**

Plaintiff further states that Hutchinson was too much of a "perfectionist" to allow such a poor work performance for a period of 3½ years without disciplinary action. (Witness: Underwriting Division and all other Staff )

**ANSWER:**

Defendant denies.

**PARAGRAPH 23:**

Plaintiff states that Hutchinson requested that Stokes write an Affidavit indicating the history of Plaintiff's quality of work. In that Affidavit, it is clear of the inexperience of Stokes to

- 36 -

provide a TRUE and CORRECT accounting of the Plaintiff s work experience in the department by making personal attacks on the Plaintiff.

**ANSWER:**

Defendant denies.

**PARAGRAPH 24:**

Plaintiff states that Hutchinson gave the impression to other individuals in the company that she was incapable of handling any other position thereby defaming the character of Plaintiff.

**ANSWER:**

Defendant denies.

**PARAGRAPH 25:**

Plaintiff states that the term "physician" as stated in the "Wikipedia.com" reads the definition of physician as "A practitioner of physic, i.e. a specialist in internal medicine, especially as opposed to a surgeon; a practitioner who treats with medication rather than with surgery.  A medical doctor trained in human medicine.  Plaintiff further states that she had every right to seek out any treatment possible in an effort to become cured.

**ANSWER:**

Defendant lacks knowledge or information sufficient to form a belief about the truth of

these allegations and therefore denies same.

**PARAGRAPH 26:**

Plaintiff states that the Defendant unlawfully discharged her on February 20, 2008 after refusing to accept the signature of her medical care provider on the short term disability forms submitted by the Plaintiff on February 13, 2008.  (Witness:  Cathy Zackiewicz, Brian Kraus, Susan Archie, Hammond Clinic)

**ANSWER:**

Defendant denies.

**PARAGRAPH 27:**

Plaintiff further states that she had the right to chose another medical provider to try and receive the proper treatment for curing of the illness.

**ANSWER:**

Defendant admits.

## OTHER DEFENSES

1.      All actions taken with respect to Plaintiff's employment were taken without regard to sex, race, age or complaints of discrimination, and therefore Plaintiff's claims should be denied.

2.      All actions taken with respect to Plaintiff were taken in good faith and for legitimate nondiscriminatory, nonretaliatory reasons, and therefore Plaintiff's claims should be denied, including those claims that she is entitled to willful or punitive damages.

3.      Plaintiff's claims should be denied to the extent they are barred by any applicable statute of limitations or to the extent they are not like or related to her discrimination charge allegations.

4.      Plaintiff's claims should be denied to the extent Plaintiff has failed to adequately mitigate her damages.

Respectfully submitted,

ILLINOIS STATE MEDICAL INSURANCE SERVICES, INC.

By:  s/Edward C. Jepson, Jr.
                        One of Their Attorneys

CHICAGO/#1804617.2

Edward C. Jepson, Jr., Bar No. 03127220
Megan Crowhurst, Bar No. 06289289
Vedder Price P.C.
222 North LaSalle Street
Suite 2600
Chicago, IL  60601-1003
(312) 609-7500
Dated: June 30, 2008

CHICAGO/#1804617.2

## CERTIFICATE OF SERVICE

The undersigned certifies that true and correct copies of the foregoing Defendant's

Answer to Amended Complaint were served on

> Sakie Scott
> 416 Merriel Avenue
> Calumet City, IL  60409

by depositing the same in the U.S. mail, first-class postage prepaid, at 222 North LaSalle Street,

Chicago, Illinois 60601-1003 on June 30, 2008.

                                    s/Edward C. Jepson, Jr.